**No. 25-1220**

_____

**UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

_____

NAUTILUS INSURANCE COMPANY,

*Plaintiff – Appellant*

v.

CORY FLEMING; MOSS & KUHN, P.A.;
CHAD WESTENDORF; PALMETTO STATE BANK,

*Defendants – Appellees*

_____

APPEAL FROM THE U.S. DISTRICT COURT OF THE
DISTRICT OF SOUTH CAROLINA
*Charleston Division*

_____

**OPENING BRIEF OF APPELLANT NAUTILUS INSURANCE COMPANY**

_____

Jaan G. Rannik, D.S.C. Bar No. 12621
jgr@epting-law.com
Epting & Rannik, LLC
44 Old Queechy Road
Canaan, NY 12029
Tel.: (843) 377-1871
Fax: (843) 377-1310

Jack R. Reiter, FBN 0028304
jack.reiter@gray-robinson.com
GrayRobinson, P.A.
333 S.E. 2nd Ave., Ste. 3200
Miami, FL 33131
Tel.: (305) 416-6880
Fax: (305) 416-6887

*Counsel for Appellant Nautilus Insurance Company*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. <u>25-1220</u>         Caption: <u>Nautilus Insurance Company v. Cory Fleming, et al.</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>Nautilus Insurance Company</u>
(name of party/amicus)

who is _____<u>Plaintiff-Appellant</u>_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☑YES ☐NO
      If yes, identify all parent corporations, including all generations of parent corporations:

      Admiral Insurance Company, which is a wholly owned subsidiary of Berkley Insurance
      Company, which is a wholly owned subsidiary of W.R. Berkley Corporation, a publicly-traded
      company.

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?                    ☐YES☑NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)        ☐YES☑NO
      If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?                    ☐YES☑NO
      If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?        ☐YES☑NO
      If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: s/Jaan Rannik                                Date:        March 21, 2025

Counsel for: Nautilus Insurance Company

- 2 -        **Print to PDF for Filing**

ii

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT ...........................................................................i

TABLE OF AUTHORITIES ...........................................................................v

JURISDICTIONAL STATEMENT ...............................................................1

STATEMENT OF ISSUES ............................................................................2

STATEMENT OF CASE .................................................................................3

SUMMARY OF ARGUMENT .......................................................................27

ARGUMENT ....................................................................................................30

    I.    THE DISTRICT COURT ABUSED IT DISCRECTION IN PROHIBITING DISCOVERY INTO THE PRIOR RELATIONSHIP BETWEEN PALMETTO STATE BANK AND MURDAUGH AND ERRED IN GRANTING SUMMARY JUDGMENT FOR THE BANK AND WESTENDORF.................................................................................. 30

    II.    THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT FOR MOSS & KUHN ON THE UNJUST ENRICHMENT CLAIM AND DIRECTING A VERDICT FOR MOSS & KUHN ON THE BREACH OF FIDUCIARY DUTY AND NEGLIGENCE CLAIMS...... 38

        A.    The District Court Erred in Granting Summary Judgment for Moss & Kuhn on the Unjust Enrichment Claim Based on Nautilus' Failure to Prove and Expectation of Payment ...................................................... 38

        B.    There Were Disputed Questions of Material Fact Precluding a Directed Verdict for Moss & Kuhn on the Claim of Breach of Fiduciary Duty .............................................................................................................. 41

            1.    Moss & Kuhn Owed a Fiduciary Duty to Nautilus.................... 42

iii

**TABLE OF CONTENTS--CONTINUED**

**Page**

2.  There Were Genuine Questions of Material Fact Regarding Whether Moss & Kuhn Breached Its Fiduciary Duty as Escrow Agent............................................................................ 43

3.  Nautilus Was Damaged By Moss & Kuhn's Breach .................. 45

C.  There Were Disputed Questions of Material Fact Precluding a Directed Verdict for Moss & Kuhn on Direct Negligence Claim .................... 45

III.  THE DISTRICT COURT ERRED IN DENYING NAUTILUS' MOTION FOR DIRECTED VERDICT ON THE VICARIOUS LIABILITY OF MOSS & KUHN FOR THE ACTIONS OF ITS PARTNER CORY FLEMING ........................................................................................ 47

IV  THE DISTRICT COURT ERRED IN DENYING NAUTILUS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE DEFENSE THAT THE SETTLEMENT WAS THE PROXIMATE CAUSE OF NAUTILUS' INJURY RATHER THAN DEFENDANTS' CONDUCT BECAUSE THE SETTLEMENT WAS VOID ...................................................................... 51

CONCLUSION............................................................................................52

STATEMENT REGARDING ORAL ARGUMENT ............................................53

CERTIFICATE OF COMPLIANCE...................................................................54

iv

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Anderson Cnty. v. Preston,*
   831 S.E.2d 911 (S.C. 2019)....................................................................................39

*Avant v. Ahern Rentals, Inc.,*
   No. 3:20-CV-01884, 2022 WL 585947 (D.S.C. Feb. 24, 2022)................... 30, 31

*Bowman v. Richland Mem'l Hosp.,*
   515 S.E.2d 259 (S.C. Ct. App. 1999) .....................................................................44

*Cent. Weslyan Coll. v. W.R. Grace & Co.,*
   143 F.R.D. 628 (D.S.C. 1992)................................................................................31

*Citizens' Bank v. Heyward,*
   133 S.E. 709 (S.C. 1925)........................................................................................37

*Columbia Wholesale Co., Inc. v. Scudder May N.V.,*
   440 S.E.2d 129 (S.C. 1994)....................................................................................38

*Crittenden v. Thompson-Walker Co., Inc.,*
   341 S.E.2d 385 (S.C. Ct. App. 1986) ............................................................. 48, 49

*Davis v. Greenwood Sch. Dist. 50,*
   620 S.E.2d 65 (S.C. 2005)............................................................................. 42, 45

*Dubuc v. Mich. Bd. of Law Examiners,*
   342 F.3d 610 (6th Cir. 2003) ..................................................................................52

*E.I. du Pont De Nemours & Co. v. Kolon Indus., Inc.,*
   637 F.3d 435 (4th Cir. 2011) ..................................................................................31

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,*
   544 U.S. 280 (2005) ................................................................................................51

*Fabre v. Bank of Am. Bank, NA,*
   523 Fed. Appx. 661 (11th Cir. 2013) .....................................................................52

v

# TABLE OF AUTHORITIES--CONTINUED

**Cases**                                                                                                                    **Page(s)**

*Froneberger v. Smith*,
   748 S.E.2d 625 (S.C. Ct. App. 2013) .................................................................47

*Hooper v. UnitedHealth Grp. Inc.*,
   No. CIV.A. 6:12-01519, 2013 WL 6654226 n.6 (D.S.C. Dec. 17, 2013) ..........42

*In re Blackbaud, Inc., Customer Data Breach Litig.*,
   567 F. Supp. 3d 667 (D.S.C. 2021) ...................................................................35

*In re Dameron,*
   155 F.3d 718 (4th Cir. 1998) .............................................................................42

*In re Murdaugh*,
   875 S.E.2d 625 (S.C. 2022)................................................................................19

*In re S.C. NAACP Hous. Advoc. Program*,
   897 S.E.2d 691 (S.C. 2024)................................................................................34

*James v. Kelly Trucking Co.*,
   661 S.E.2d 329 (S.C. 2008)................................................................................37

*Jones v. Elbert*,
   34 S.E.2d 796 (S.C. 1945)..................................................................................48

*Koppers Performance Chems., Inc. v. Travelers Indem. Co.*,
   638 F. Supp. 3d 610 (D.S.C. 2022) ...................................................................30

*Lance v. Dennis*,
   546 U.S. 459 (2006) ...........................................................................................51

*McCray v. Maryland Dep't of Transp.*,
   741 F.3d 480 (4th Cir. 2014)..............................................................................31

*Miles v. Miles*,
   711 S.E.2d 880 (S.C. 2011)................................................................................44

## TABLE OF AUTHORITIES--CONTINUED

**Cases**                                                                                 **Page(s)**

*Moore v. Weinberg*,
  681 S.E.2d 875 (S.C. 2009)........................................................ 42, 45, 46

*Murphy v. Jefferson Pilot Commc'ns Co.*,
  613 S.E.2d 808 (S.C. Ct. App. 2005) .................................................47

*Myrtle Bch. Hosp., Inc. v. City of Myrtle,*
  *Bch.*, 532 S.E.2d 868 (S.C. 2000)................................................ 38, 39

*Okatie River, L.L.C. v. Se. Site Prep, L.L.C.,*
  577 S.E.2d 468 (S.C. Ct. App. 2003) .................................................40

*Oppenheimer Fund, Inc. v. Sanders,*
  437 U.S. 340 (1978) ........................................................................30

*RFT Mgmt. Co. v. Tinsley & Adams L.L.P.,*
  732 S.E.2d 166 (S.C. 2012).............................................................41

*Rickborn v. Liberty Life Ins. Co.,*
  468 S.E.2d 292 (S.C. 1996)........................................................ 36, 49

*Spence v. Wingate,*
  716 S.E.2d 920 (S.C. 2011).............................................................41

*Taylor v. Medenica,*
  479 S.E.2d 35 (S.C. 1996)...............................................................32

*Tedder v. Dixie Lawn Serv., Inc.,*
  No. 2007-UP-249, 2007 WL 8327512 (S.C. Ct. App. May 22, 2007) ...............47

*Tefft v. Tefft*,
  No. 2011-UP-096, 2011 WL 11733114 (S.C. Ct. App. Mar. 10, 2011)..............44

*Thomerson v. DeVito*,
  844 S.E.2d 378 (S.C. 2020).............................................................39

## **TABLE OF AUTHORITIES--CONTINUED**

**Cases**                                                                    **Page(s)**

*Trigo v. Moore*,
  No. 92-1516, 1993 WL 192758 (4th Cir. June 7, 1993) .....................................41

*United States v. Murdaugh*,
  No. CR 9:23-396, 2024 WL 1348845 (D.S.C. Mar. 28, 2024)...........................19

*United States v. Pemberton*,
  713 Fed. Appx. 221 (4th Cir. 2018) .....................................................................33

*Upchurch v. Upchurch*,
  624 S.E.2d 643 (S.C. 2006).......................................................................... 44, 52

*Wade v. Berkeley Cnty.*,
  498 S.E.2d 684 (S.C. Ct. App.1998) ...................................................................48

*Weatherford v. E.I. Dupont de Neumours & Co.,*
  No. 4:22-CV-01427, 2023 WL 11015357 (D.S.C. Sept. 27, 2023)....................35

*Webb v. First Fed. Sav. & Loan Ass'n*,
  388 S.E.2d 823 (S.C. Ct. App. 1989) ..................................................................38

*Woods v. Dolgencorp, Inc.*,
  No. 7:20-CV-04399, 2021 WL 5989965 (D.S.C. Dec. 17, 2021) ......................49

*Wright v. Craft,*
  640 S.E.2d 486 (S.C. Ct. App. 2006) ..................................................................32

**Statutes**

18 U.S.C. § 1964 ........................................................................................................1

28 U.S.C. § 1291 ........................................................................................................1

28 U.S.C. § 1332 ........................................................................................................1

28 U.S.C. § 1367 ........................................................................................................1

## TABLE OF AUTHORITIES--CONTINUED

**Statutes,** *cont'd*                                              **Page(s)**

28 U.S.C. § 2201 ......................................................................................................1

S.C. Code Ann. § 33-19-340(b) ................................................................... 40, 44, 47

S.C. Code Ann. § 39-5-10(b) .................................................................................32

**Rules**

Fed. R. Civ. P. 26(b)(1)..........................................................................................30

**Other Authorities**

42 C.J.S. *Implied Contracts* §§ 14 & 19 (1991) .......................................................40

Am. Jur *Escrow* §§ 1, 3 (May 2025 Update) ...........................................................42

Committee Notes on Rules—2000 Amendment, FRCP 26(b)(1) ........................... 31

News Release, 2024 WL 1367200 (D.O.J. Apr. 1, 2024) ......................................19

Ralph K. Anderson, Jr. Master & Servant - Liability of Master, S.C. Requests to Charge - Civ. § 5-7 ...................................................................................... 49

RESTATEMENT (SECOND) OF AGENCY § 228(1) (1958)...........................................48

## JURISDICTIONAL STATEMENT

The district court possessed subject-matter jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeded $75,000 and suit was between citizens of different States. *See* JA1346-1347 ¶¶ 2-7. The district court also had jurisdiction over the declaratory judgment claim under 28 U.S.C. § 2201, and over the remaining claims under 28 U.S.C. § 1367 and 18 U.S.C. § 1964.

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 because the district court rendered a final decision. *See* JA5080-5081.

This appeal was timely. The final judgment was filed on January 31, 2025, and Plaintiff Nautilus Insurance Company filed a timely Rule 50(b) motion on February 4, 2025, that was denied on February 20, 2025. *See* JA5082-5088, JA5115-5117. Nautilus timely appealed the final judgment on February 28, 2025. *See* JA5118-5119. The final judgment disposes of all parties' claims. *See* JA5080-5081.

1

**STATEMENT OF ISSUES**

1.      Whether the district court abused its discretion in prohibiting Nautilus' relevant and proportional discovery into the prior acts of Palmetto State Bank, and then erred in granting summary judgment for the Bank and its Vice President, Chad Westendorf, because Nautilus lacked such evidence.

2.      Whether the district court erred in granting summary judgment for Moss & Kuhn on the unjust enrichment claim and in directing a verdict for Moss & Kuhn on the breach of fiduciary duty and negligence claims.

3.      Whether the district court erred in denying Nautilus' motion for directed verdict on the vicarious liability of Moss & Kuhn for the actions of its named partner Cory Fleming.

4.      Whether the district court erred in denying Nautilus' motion for partial summary judgment on whether the settlement was the proximate cause of its injury rather than Defendants' conduct.

**STATEMENT OF CASE**

## A.    INTRODUCTION

Cory Fleming and Richard "Alex" Murdaugh were "good friends" and knew each other since law school.  After Murdaugh's housekeeper, Gloria Satterfield, fell at Murdaugh's home, Fleming and Murdaugh concocted a scheme to defraud Nautilus Insurance Company.[1]  Murdaugh falsely claimed that before EMS arrived on the scene following the fall, his housekeeper told him that his dogs caused her fall.  Mrs. Satterfield was hospitalized for a head injury and died a few weeks later.

Murdaugh asked Fleming, a named partner at the time with Moss Kuhn & Fleming,[2] to bring a claim against him on behalf of the Estate of Gloria Satterfeld to collect on Murdaugh's insurance, including a Nautilus $5 million umbrella policy.  Through the participation of Chad Westendorf, the personal representative of the Satterfield Estate and an officer at Palmetto State Bank (the "Bank"), and with

---

[1] Fleming also worked for Murdaugh's father as a prosecutor and was friends with Murdaugh's wife. JA4769.  Murdaugh worked at Fleming's law firm after law school and co-counseled with Fleming on eight cases after 2001.  JA4942-4943.

[2] Fleming had been a partner at the law firm since the early 2000's. JA4937-4938.  The firm changed its name from Moss, Kuhn & Fleming to Moss & Kuhn when Fleming was disbarred. JA4938-4939.  Moss & Kuhn is no longer operating and is now known as the Kuhn Law Firm. JA4939.  For simplicity, Nautilus will refer to the law firm as "Moss & Kuhn" throughout.

3

knowledge and authorization of the Bank's CEO, Russell Laffitte,[3] Fleming and Murdaugh defrauded Nautilus into paying $3.8 million for the bogus claim, part of which would be funneled to Fleming and then to Murdaugh. Mrs. Satterfield's heirs were not notified of the settlement.

The district court prohibited Nautilus from taking discovery relating to Murdaugh's prior fraudulent schemes with the Bank, and then entered summary judgment for the Bank and Westendorf, in part, because Nautilus lacked evidence for its claims. The district court also entered summary judgment for Moss & Kuhn on Nautilus' unjust enrichment claim based on its failure to prove the "expectation of payment" and, at the same time, denied Nautilus' motion for partial summary judgment based on the *Rooker-Feldman* doctrine despite the lack of a predicate state court judgment.

At trial, the district court entered a directed verdict for Moss & Kuhn on the claims for breach of fiduciary duty and direct negligence although it was undisputed that, as an escrow agent, Moss & Kuhn released the funds without a filed order approving the settlement – which was a condition on the escrow funds and is also required by South Carolina law. The district court denied Nautilus' motion for a

---

[3] Laffitte orchestrated with Murdaugh a Ponzi scheme through the Bank to steal money from Murdaugh's clients for over a decade. JA671, JA678, JA1602 n.21. On information and belief, Murdaugh required new funds to replace the stolen funds and owed the Bank millions of dollars when Mrs. Satterfield fell. *See* JA3425, JA159-161, JA3525.

4

directed verdict on the vicarious liability of Moss & Kuhn even though the undisputed facts showed that: (i) Fleming, a partner, was acting in the scope of his employment when he settled the case and then misappropriated his client's funds, and (ii) the firm benefitted from Fleming's misconduct by collecting a substantial fee directly from the settlement funds.

## B.    THE FACTS

### 1.    The Fraudulent Claim

On February 2, 2018, Murdaugh's housekeeper, Gloria Satterfield, fell down the front steps at Murdaugh's property and hit her head.  JA4593, JA2902.  There were no eyewitnesses.  JA4088.  Ms. Satterfield was unconscious when EMS arrived, but Murdaugh falsely claimed she said his dogs caused her fall.  JA4621-4623, JA4809-4810.  If true, this would create strict liability for Murdaugh under South Carolina law.  JA4617-4618, JA4620.  Mrs. Satterfield was taken to the hospital, told hospital staff she had no idea why she fell, and then died a few weeks later on February 26, 2018.  JA2902, JA4088, JA4593.

Around March 1, 2018, Murdaugh approached Fleming and requested that he bring a claim against him on behalf of the Satterfield Estate.  JA4613, JA4745.  About a week later, Fleming wrote to Murdaugh on his firm's letterhead that he represented the Satterfield Estate and directed him to notify his insurance carriers.  JA4072, JA4615, JA4743, JA4745, JA4748.

### 2.    The Insurance Coverage

The first layer of coverage on the Murdaugh property was underwritten by Lloyd's of London for $505,000. JA2902, JA4636-4637. Nautilus provided excess coverage of $5 million. JA4637, JA4810, JA2902. The Nautilus policy would not provide coverage to Murdaugh, however, if he "made fraudulent statements or engaged in fraudulent conduct in connection with any 'occurrence' or offense for which coverage is sought under this policy." JA3908 ¶ IV.Q(4), JA4860.

### 3.    The Lloyd's Settlement

Lloyd's tendered its policy limits on November 12, 2018, on the advice of its coverage counsel. JA4115-4117, JA4631-4632, JA4640-4641, JA4654, JA4815. Lloyd's believed that "it is likely that there will be exposure beyond the Policy limits given the circumstance surrounding Ms. Satterfield's death, the amount of medical bills incurred [$700,000] and other potential economic damages." JA4116.

Fleming did not notify Mrs. Satterfield's heirs about this settlement.[4] JA4644, JA4665. After speaking with Murdaugh, Fleming held the Lloyd's tender letter until *Murdaugh* changed the personal representative from Mrs. Satterfield's son, Michael "Tony" Satterfield, to Chad Westendorf, the Bank vice-president, to "manage the money." JA4075-4080, JA4118, JA4121, JA4123-4125, JA4602, JA4643-4646,

---

[4] Mrs. Satterfield has two sons Michael and Bryan Harriot. JA4094. Bryan is mentally disabled, does not work, and lived with Mrs. Satterfield. JA4094-4095.

6

JA4750, JA4784.  Before this change occurred, Fleming directed Lloyd's to issue payment to: "Chad Westendorf as Personal Representative of the Estate of Gloria Satterfield and Moss, Kuhn & Fleming, P.A."  JA4122, JA4663-4664.[5]

### 4.    Westendorf as Personal Representative

Fleming did not speak with Westendorf about his appointment; Westendorf spoke only with Murdaugh, and Murdaugh's office notarized the verification. JA4784-4786.  When the parties met with the court, Fleming told Westendorf that "[Fleming] was going to handle most of it" and that Fleming would direct him what to do.  JA4787.  Indeed, this was Westendorf's first and only appointment as a personal representative; he was entirely unaware of a personal representative's duties and made no effort to educate himself.  JA4766, JA4786.  Westendorf never: opened an account for the Satterfield Estate; sent documents to or communicated with Mrs. Satterfield's sons; paid the survival claims funds into the probate court; managed any of the settlement funds or reported to Fleming about any settlement monies; learned about the tax consequences of a structured settlement versus a lump sum settlement; or notified Mrs. Satterfield's sons of the settlements or that he was

---

[5] The Lloyd's settlement suffered from many of the same "irregularities" as the later Nautilus settlement including no notice to Fleming's clients, *see* JA4644, JA4665, Fleming's diversion of the settlement funds to a "Forge" account controlled by Murdaugh, *see* JA4221, and Fleming lying about the amount of his fees and expenses, *see* JA1668, JA4670, JA4679.

dismissing the case. JA4788-4789, JA4796-4798, JA4655-4656, JA4661-4662. Westendorf's only involvement was attending two settlement meetings with the probate court and a "few" telephone conversations with Fleming during the mediation. JA4789. Fleming acknowledged that the settlement funds allocated to the survival action (about $125,000) should have been managed by Westendorf and distributed to Mrs. Satterfield's sons under the probate laws. JA4656-4658. Fleming never inquired about this allocation or the funds that were supposedly deposited with "Forge" for the benefit of Mrs. Satterfield's sons. JA4658-4659, JA4660. He "trusted" that Murdaugh, who he intended to sue, was handling that. JA4659.

The day after Westendorf was appointed, *see* JA4124, Fleming petitioned the court to approve the Lloyd's settlement on Westendorf's behalf. JA4127-4129, JA4667-4669. Fleming misrepresented his firm's attorneys' fees in the petition as $166,000.00 and his prosecution expenses as $11,500. JA4128, JA4670, JA4679. The petition disclosed the total Lloyd's settlement of $505,000 but only allocated $30,000 to the Satterfield Estate for the $700,000 in medical expenses. JA4673-4674, JA4128. Westendorf did not ask for any backup to the numbers on the settlement statement, *see* JA4165, because he "just trusted what they were telling [him]." JA4795.

8

### 5. Nautilus' Investigation[6]

Once Lloyd's tendered its limits, Nautilus' coverage was triggered and Nautilus assumed the defense and retained John Grantland, Esq. to defend Murdaugh. JA4815-4816. Lloyd's provided Murdaugh's recorded statement to Nautilus wherein he perpetuated his lie about the cause of Mrs. Satterfield's fall. JA4808. Nautilus investigated the claim by interviewing the first responders and obtaining the veterinarian and training records for the dog allegedly involved. JA4810-4811. Despite its investigation, Nautilus was concerned about Murdaugh's strict liability. JA2910.

A November 6, 2018 investigative report provided to Nautilus by Lloyd's revealed that Murdaugh's wife, Maggie, said that Mrs. Satterfield's relatives told her that "the dogs tripped [her] up." JA4093, JA4872. Murdaugh's son, Paul, validated his father's lie by stating that Mrs. Satterfield "said something about dogs" to his father. JA4094, JA4872.[7] The report noted that liability was "probable" because of the strict liability imposed by South Carolina law for injuries caused by dogs. JA4088, JA4097. The report also stated that the Fourteenth Judicial Circuit is

---

[6] Amy Miller, the claims adjuster assigned to the claim for Nautilus, testified at trial. JA4806, JA4802 *et seq.*

[7] At this time, there was no evidence refuting Murdaugh's version of the accident as corroborated by his wife and son, Paul. JA4812.

9

"plaintiff-friendly," and that Hampton County is one of the "most pro-plaintiff venues in South Carolina, largely because of the influence of Mr. Murdaugh's law firm" and that a Hampton County jury would view him "very favorably." JA4096. The report also noted that the resident judges "know Mr. Murdaugh and Mr. Fleming well," which reinforced the belief that he would appear credible. JA4096. The report estimated that the total damages could be $3.3 million. JA4097.

Thus, although Nautilus doubted Murdaugh's story, Nautilus found no conflicting evidence and concluded that Murdaugh would have been found liable at trial based on South Carolina law. JA4819, JA4824.

### 6.    The Collaboration Between Murdaugh and Fleming

Unbeknownst to Nautilus, Murdaugh and Fleming effectively acted as co-counsel in the claim against Murdaugh. Shortly after Mrs. Satterfield's death, Murdaugh stated in correspondence that *he* represented the Satterfield Estate. JA4073, JA5371-5372, JA5375. Fleming's office communicated directly with Murdaugh, not Murdaugh's defense counsel, about medical authorizations so that Murdaugh could obtain the medical records directly. JA5378-5381, JA4632-4635, JA4750, JA4084. Fleming also never told Grantland that he and Murdaugh were "collaborating" on the Satterfield Estate's representation. JA4635.

Because Nautilus considered this a strict liability case, Grantland focused on the potential damages by requesting Mrs. Satterfield's past medical records and

10

evaluating the relationship between her and her sons. JA4816, JA2928. Grantland advised Nautilus that with $700,000 in medical bills, Murdaugh "admitting fault," and the trend for "astronomical verdicts on nominal damages" in Hampton County, a jury verdict would likely exceed Nautilus' coverage. JA2916; *accord* JA4768. Grantland believed that for the case to settle at mediation, Nautilus needed to pay between $3 and $4 million or "most of the policy." JA2966-2967.

Fleming and Murdaugh pressured Nautilus to mediate and, in one instance, jointly called Grantland to expedite the mediation. JA4826-4827, JA4136, JA2930-2932. Murdaugh, who knew about Mrs. Satterfield's prior health problems, did not want the pending release of Mrs. Satterfield's medical records to derail the mediation. JA4844, JA4145. Before mediation, Fleming lied to Grantland that he had never heard Murdaugh's explanation for Mrs. Satterfield's fall and pushed for a pre-suit deposition of Murdaugh. JA4138, JA4616-4617, JA4691, JA2934-2935. Fleming did so to ensure that once Murdaugh explained the cause of the fall, Murdaugh would be strictly liable. JA4692-4693, JA4828-4829. Fleming conceded that if Nautilus had contested liability, it would have been a "dangerous case" for Nautilus with bad faith exposure. JA4694.

### 7. The Nautilus Mediation

At mediation, Fleming misrepresented that Mrs. Satterfield's sons did not appear because they did not want to be in the same room as Murdaugh. JA4830,

11

JA3026. In reality, neither Westendorf, Murdaugh, nor Fleming told Mrs. Satterfield's sons about the mediation, and no one involved them in the settlement process. JA4697, JA4699-4670. Fleming and Murdaugh conversed frequently and privately and Murdaugh was in a separate room from his defense counsel and the Nautilus representative. JA4836-4837. Fleming asked if Murdaugh could make a statement, which was "really unusual." JA4831. Murdaugh repeated his concern about his reputation if suit was filed and threatened Nautilus with a bad faith claim if it did not settle. JA4831-4832. The Nautilus representative stated she understood Murdaugh's desire to take care of the Satterfield boys, but that she did not believe the case was worth $5 million. JA4833-4834. Murdaugh then became "unhinged," slammed both fists on the table and stated that he did not give a "f**k" about the Satterfields. JA4834. Because of this "horrific" and "frightening" display, Nautilus attempted to leave the mediation, but Murdaugh blocked the Nautilus representatives from their Uber and forced them to remain. JA4834-4835. Nautilus agreed to resume the mediation. JA4835.

The case did not settle at mediation, but the mediator proposed that Nautilus pay $3.8 million. JA4697-4698, JA4835-4836, JA2970-2971. The parties did not discuss a structured settlement even though a representative from a structured settlement company was there. JA4845-4846. Fleming lied again and said that

Michael Satterfield agreed to accept the meditator's $3.8 million proposal. JA4835-4836, JA4842, JA2971, JA3023-3024, JA3033, JA3036-3037.

### 8. The Nautilus Settlement

Nautilus settled soon after the mediation for $3.8 million. JA4842, JA4845, JA2972-2973, JA3058-3059. Nautilus was not "happy" with the settlement but recognized the exposure to Murdaugh and fulfilled its duty to protect him. JA4842.

The agreement provided that the settlement funds would be held in trust until the settlement was court-approved, and that the settlement petition and order would not have an adversarial caption as required by either Fleming or Murdaugh. JA4142, JA4773-4774, JA3038-3039. Unbeknownst to Nautilus, neither Fleming nor Westendorf reported the settlement to their clients, Mrs. Satterfield's sons. JA4596.

Grantland emailed Fleming about a structured settlement and Fleming confirmed that he would structure the settlement through "Forge" with "an administrator that serves the purpose of a conservator." JA4146, JA4148. This implied the use of Forge Consultants, a company that facilitates structured settlements. Murdaugh, however, had opened a bank account in his name "d/b/a Forge" that he and Fleming used to steal the settlement funds. *See* JA4222.

Fleming lied to Grantland that Mrs. Satterfield's sons did not want publicity about the settlement. JA3023-3025. Fleming also lied to Grantland that he needed to confirm with "Forge" whether Moss, Kuhn & Fleming should be on the settlement

13

check. JA4148, JA4701-4702. If he had told Grantland the truth – that he was going to consult with Murdaugh instead – he knew it would raise red flags. JA4702-4703. Based on Fleming's direction, the settlement check was made payable to: "Chad Westendorf as Personal Representative of the Estate of Gloria Satterfield & Moss Kuhn & Fleming PA as Attorney." JA4152, JA4154, JA4703, JA4850, JA4500.[8] Grantland sent the check to Fleming at the address for Moss, Kuhn & Fleming, P.A. JA4850-4851, JA4154. **Grantland directed Fleming to "hold the settlement funds in trust until the Petition and Order Approving Settlement have been signed *and filed* at the Probate Court settlement hearing."** JA4154 (emphasis added); *see also* JA4704, JA4793, JA3076. Fleming deposited the check into the trust account of Moss Kuhn & Fleming P.A. JA4703, JA2988-2989.

### 9.    The Settlement Conference

By agreement with Grantland, the petition to approve the settlement was filed in circuit court, not probate court, and did not contain the case number or Murdaugh's name in the caption. JA4158-4164, JA4705, JA4707, JA4710, JA4736, JA2990, JA3040. Murdaugh purportedly did not want his name in the caption to eliminate further publicity following his son's involvement in a fatal boating

---

[8] The deposition designations of Fred Kuhn read at trial were not transcribed by the court reporter, but Kuhn's deposition and the designations were filed. *See* JA4414-4420, JA4439-4512.

accident.  JA4706.  According to Fleming, Murdaugh *and* Grantland asked the court not to file the order immediately, and Fleming left court with the signed copy of the order, indicating that he would send the signed order to Grantland for filing after "everything had calmed down."  JA4707-4708, JA4712, JA4736.  But Westendorf, who also attended the settlement conference, testified that *Fleming* requested that the order not be filed.  JA4793.  Grantland, who was *not* at the conference, also testified that Fleming told him that he would file the order.  JA2993-2994, JA2997, JA3021.  Grantland denied discussing with Fleming or Murdaugh the delayed filing of the order.  JA3020-3021.

**No order approving the settlement was ever filed.**  Fleming mailed the original order to Grantland, purportedly for filing, but the cover letter is silent on that point, *see* JA3973, JA2995-2996, JA3006-3007, JA3012, and Fleming never reached out to Grantland about why he had not filed the original order.  JA3081.  Neither the existence, nor the amount, of Nautilus' settlement was ever made public.  JA4708, JA4711.

**10.    The Disbursement of the Settlement Proceeds**

Although the disbursement of the settlement funds out of Moss & Kuhn's trust account was expressly conditioned on the filing of the order approving the settlement, Moss & Kuhn allowed Fleming to disburse the funds to Murdaugh, Westendorf, and to the firm.

### a. Murdaugh, Fleming & Westendorf

Fleming misrepresented to the court that he was taking a full one-third fee, when in fact he reduced it by 50% and inflated his expenses, representing that they were $105,000 when they were actually only $1,512.46 for the mediator's fee. JA4590-4595, JA4596-4597, JA4718-4720, JA4723-4724, JA4165, JA4767. Fleming expected Murdaugh to take about $100,000, *see* JA4719, but Murdaugh misappropriated $3,079,931.95 from the checks issued by Fleming from the Moss & Kuhn trust account and made payable to "Forge." JA4603-4604, JA4608, JA4611-4612, JA4652, JA4720, JA4724, JA4725, JA4177-4178, JA4221, JA4222, JA4741-4742. Murdaugh deposited one check for $2,961,931.95 into his Bank of America account, endorsing the check with his own signature followed by "dba Forge." JA4729, JA4222. A second check for $118,000 was later paid to Forge out of the trust account. JA4178. Despite his firm's receipt of the first cancelled check and endorsement, Fleming denied knowledge of Murdaugh's master plan at trial. JA4604, JA4613, JA4653, JA4721.

In addition to the $600,000+ fee Fleming and Moss & Kuhn "earned" from the representation Fleming made three payments to himself totaling about $26,200 that he falsely identified as expenses. JA4595-4596, JA4598-4599, JA4177-4178. At Murdaugh's direction, Fleming also retained $150,000 in fabricated prosecution expenses in his trust account for his and Murdaugh's personal benefit. JA4603.

Fleming paid Westendorf a fee of $20,000 for the Nautilus settlement which he did not disclose to the court.  JA4165, JA4178, JA4741, JA4796.

### b.     Moss & Kuhn

Moss & Kuhn collected a fee of $600,055.59 from the Nautilus settlement for its representation of the Satterfield Estate.  JA4598-4599, JA4725, JA4741-4742, JA4948, JA4178.  Under Moss & Kuhn's standard practice, when a partner of the law firm earned a fee on a case, the funds were deposited into the firm's operating account and applied to firm expenses.  JA4956.  The "lion's share," but not all, of the fees from the Nautilus settlement went to Fleming.  JA4909-4910, JA4957.

Moss & Kuhn's accountant reconciled the firm's operating and trust accounts and one or more of the firm's shareholders reviewed it about once a month which Fred Kuhn acknowledged was an "obligation."  JA4461, JA4939, JA4952.  Kuhn did not believe his firm had any duty to ask for proof that expenses were actually incurred.  JA4952.  The monthly bank statement for Moss & Kuhn's trust account included images of the checks that were drawn from the account, including the checks to Forge endorsed by Murdaugh.  JA4958. The endorsed checks returned by the bank to Fleming and Moss & Kuhn contradicted their claim that they did not know that Murdaugh was stealing the funds.  JA4729-4730.

### c.     The Satterfield Estate

Following the disbursements from Moss & Kuhn's trust account, $113,800

17

remained in the account. JA4742-4743, JA4178. Once the fraud was uncovered several years later, Kuhn sent the $113,800 to new counsel for Mrs. Satterfield's sons as reimbursement. JA4949. Kuhn later "scraped together" $650,000 and also sent it to counsel for Mrs. Satterfield's sons as reimbursement for the fee taken by the firm. JA4949. Mrs. Satterfield's sons would later recover additional funds after suing Fleming's law firm and the Bank regarding the fraudulent scheme. JA4743.

### 11. The Facts Hidden From Nautilus

The conspirators ensured that Nautilus did not know about the fraudulent scheme during the handling of the claim. JA4873. If it did, it would not have paid the claim. JA4873. However, because of Fleming and Murdaugh's secret communications and unethical conduct, facilitated by the Bank's appointment of a sham fiduciary, Nautilus did not see many red-flag facts that would have precluded settlement and prompted referral of the case to its fraud unit. *See* JA4820, JA4821-4822, JA4830-4831, JA4837, JA4838, JA4849, JA4851, JA4852, JA4855-4856, JA4857, JA4861-4862, JA4863-4864.

## C. COLLATERAL PROCEEDINGS

### 1. Fleming

For his misconduct in the Satterfield matter, Fleming was criminally prosecuted, pled guilty to insurance fraud, conspiracy, and breach of trust with fraudulent intent, admitted to lying to the South Carolina circuit court, and was

serving time in federal prison at the time of the trial. JA4599-4601, JA5065, JA4223-4229, JA3618-3663. The South Carolina Supreme Court disbarred Fleming in 2023. JA4590, JA5066.

### 2.    Murdaugh

The South Carolina Supreme Court disbarred Murdaugh in July 2022. *See In re Murdaugh*, 875 S.E.2d 625 (S.C. 2022).

In early 2023, Murdaugh was tried and convicted for the murder of his wife, Maggie, and their 22-year old son, Paul, and sentenced to two consecutive life sentences. JA314.

In November 2023, Murdaugh pled guilty to state charges of money laundering, wire fraud, bank fraud, and conspiracy to commit wire fraud and bank fraud and sentenced to 27 years in prison. *United States v. Murdaugh*, No. CR 9:23-396, 2024 WL 1348845, at *1 (D.S.C. Mar. 28, 2024). The federal government also sentenced Murdaugh to 40 years for his financial fraud crimes and to pay reparations of $8.7 million to his victims. *See* News Release, 2024 WL 1367200 (D.O.J. Apr. 1, 2024).

### D.    THE CASE

### 1.    Pretrial

On August 15, 2023, Nautilus filed its Second Amended Complaint alleging fourteen counts against Defendants Murdaugh, the Bank, Moss & Kuhn, and

19

Westendorf, as summarized below:

| COUNT | CAUSE OF ACTION | DEFENDANT(S) |
|---|---|---|
| 1 | Fraud | Murdaugh |
| 2 | Civil Conspiracy | All |
| 3 | Negligence | the Bank |
| 4 | SCUTPA | All |
| 5 | Breach of Fiduciary Duty | Moss & Kuhn, Westendorf, the Bank |
| 6 | Breach of Contract | Moss & Kuhn, Westendorf, the Bank |
| 7 | Aiding & Abetting Breach of Fiduciary Duty | Murdaugh, Westendorf, the Bank |
| 8 | Aiding & Abetting Fraud | Moss & Kuhn, Westendorf, the Bank |
| 9 | Unjust Enrichment | All |
| 10 | Conversion | All |
| 11 | Breach of Contract | Murdaugh |
| 12 | RICO | All |
| 13 | Negligence | Moss & Kuhn |
| 14 | Declaratory Judgment | N/A |

In his answer, Fleming admitted that "Defendants engaged in a series of schemes of this type and pattern beginning as early as 2011 to provide funds for the benefit of [the Bank], Murdaugh, and Fleming, when the Defendants knew that the funds being used were taken from other innocent parties and clients of Murdaugh

20

and [the Bank] contrary to federal and state laws." JA3801 ¶ 25 (am. answer); JA1351 ¶ 15(q) (compl.); *see also* JA4754. Fleming also admitted that the former Bank CEO, Russell Lafitte, was indicted in May 2022 for agreeing to, participating in, and assisting in the schemes with Murdaugh and was found guilty by a federal jury in November 2022. JA3801 ¶ 25; JA1351 ¶ 15(r). In support of its claims, Nautilus alleged numerous facts related to the Bank and its prior illegal dealings with Murdaugh. *See* JA1348 ¶ 15(d); JA1350-1351 ¶¶ 15(m), (n), (o), (p), (q), (r).

On August 15, 2023, the district court questioned Nautilus' counsel regarding the evidence for its claims against the Bank and ordered a two-phased discovery plan; the first phase would focus on, *inter alia,* the Bank's "potential culpability" and "threshold liability." *See* JA1411, JA1426. The district court's order clarified that the first phase would "focus[ ] on the liability of the Defendants regarding the payment by Plaintiff of the claim arising out of the death of Gloria Satterfield." JA1403-1404. The district court prohibited any discovery into the prior scheme between Murdaugh and Laffitte and "tracing money Murdaugh paid to [the Bank] from the looted Satterfield settlement unless there was evidence that [the Bank] was aware the funds were stolen by Murdaugh." JA1519 (citing JA1416-1417). The second phase would include "conduct or actions which preceded the Satterfield payment." JA1403-1404.

21

On September 22, 2023, Nautilus asked the district court to clarify "whether sufficient evidence has been presented in support of Nautilus' theory of liability against the Bank such that it may inquire into relevant conduct prior to 2018." JA1502. The motion recited the evidence of Westendorf's and the Bank's liability. JA1494-1498. The motion was denied. JA1511. When the district court blocked this discovery, the discovery cut-off was still more than three months away (Nov. 28, 2023), *see* JA54 ¶ 5], and was ultimately extended again to March 15, 2024. JA1529 ¶ 2.

The district court clerk granted *Murdaugh's* motion for default, JA3333, where he acknowledged that he "invented a story about his dogs causing the death of Gloria Satterfield" to steal settlement monies from his insurers. JA3268. The district court subsequently entered a default judgment against Murdaugh. JA4422-4423, JA4424.

On October 4, 2023, Nautilus moved to depose Murdaugh and Laffitte, the former CEO of the Bank, who were both incarcerated, on certain topics. JA1513-1514. The district court acknowledged that Murdaugh and Laffitte had engaged in prior schemes where Murdaugh, as a plaintiffs' attorney, and Laffitte, as the fiduciary for Murdaugh's clients, conspired to steal client funds that were deposited in the Bank. JA1518-1519. Nonetheless, the district court blocked any questions about the prior "Murdaugh/Laffitte schemes." JA1519, JA1520.

22

The district court subsequently granted summary judgment in favor of Defendants Westendorf and the Bank on the eleven claims against them. JA3761-3763. The Bank's motion was largely based on the lack of evidence against it. *See* JA2094 *et seq.*

### 2. Trial

Because of the pretrial rulings and the default judgment against Murdaugh, Nautilus proceeded to trial against Fleming and Moss & Kuhn on five claims: (1) civil conspiracy; (2) negligence; (3) violation of SCUTPA; (4) breach of fiduciary duty; and (5) breach of contract. JA4550. Nautilus also asserted that Moss & Kuhn was vicariously liable for Fleming's misdeeds. JA4577.

The trial was held from January 6 to January 8, 2025. JA4540, JA4732, JA4933. Nautilus presented three witnesses: Fleming, Westendorf, and Amy Miller, the former claims adjuster for Nautilus, *see* JA4732-4928; and read portions of Fred Kuhn's deposition, JA4782-4783. Fleming read portions of Grantland's deposition. JA4924; JA2887-3088 (dep.); JA4425-4430 (designations). Moss & Kuhn's only witness was Fred Kuhn, a named partner at Moss & Kuhn and its corporate representative. *See* JA4935-4960.

### a. Motions for Directed Verdict

At the close of Nautilus' case-in-chief, Fleming moved for a directed verdict on Nautilus' claims for civil conspiracy, breach of SCUTPA, breach of fiduciary

23

duty, and breach of contract. JA4905-4919. Moss & Kuhn also moved for directed verdict on its vicarious liability for civil conspiracy and violation of SCUTPA and the direct negligence claim. JA4907. The district court denied Defendants' motions on the civil conspiracy and SCUTPA claims, *see* JA4910, JA4912, JA4913, JA4431, and refused to direct a verdict for Moss & Kuhn's on the negligence claim. JA4920-4921, JA4431.

On Moss & Kuhn's vicarious liability for civil conspiracy, however, the district court found evidence that Fleming "was very much in the scope and course of his duties" when "[h]e was committing unlawful acts" because he used the firm's letterhead and escrow account, and the firm earned a "significant" fee. JA4911; *see also* JA4966-4967. On Moss & Kuhn's vicarious liability for the SCUTPA claim, the district court rejected Moss & Kuhn's argument that Fleming's conduct did not benefit the law firm. JA4913. In denying the motion on the direct claim for negligence against Moss & Kuhn, the district court found:

> I was a senior partner of a law firm. I had a duty to make sure that the people in my law firm acted honorably. . . . I had a duty to make sure that my law firm operated ethically and properly.
> And I think the problem here is these monies go through the escrow account. And Mr. Fleming is stealing money with no supervision. He's listing costs that don't exist. And normally you itemize – you have everything itemized. And he's just – you know, I saw these different amounts, 8,000, 8500, et cetera. He's looting from a client of the firm. He's a member of the firm.
> They've heard this rampant dishonest and corrupt conduct going on within their law firm by a member of the firm, who is among other things looting money out of the escrow account. And all of this would

24

– you know, would put reasonable folks on notice, hold it a minute, they have a duty here to protect from this kind of conduct.

JA4920, JA4921.

The district court granted directed verdicts for Defendants Fleming and Moss & Kuhn on Nautilus' breach of contract and breach of fiduciary duty causes of action finding that there was no injury and that Fleming did not breach any duty related to the signed settlement agreement. JA4915-4916, JA4917-4919, JA4431, JA4961.

At the close of the evidence, the district court denied Fleming's renewed directed verdict motions on the civil conspiracy and SCUTPA claims. JA4961, JA4433. The district court also denied Moss & Kuhn's renewed direct verdict motion on the vicarious claims but invited argument from Moss & Kuhn on the duty element of the negligence claim. JA4962, JA4963-4964. In the end, the district court directed a verdict for Moss & Kuhn's on the direct negligence claim because it did not believe that Moss & Kuhn owed any duty to Nautilus and concluded that Nautilus was piggy-backing on the claims of Mrs. Satterfield's sons. JA4965, JA4966, JA4968, JA4433.

The district court also denied Nautilus' motion for directed verdict on the civil conspiracy and the SCUTPA claims against Fleming and on the vicarious liability claims against Moss & Kuhn. JA4968-4969, JA4433.

### b. The Verdicts & Post-Trial Proceedings

On January 8, 2025, the jury returned a verdict against Fleming on the civil

25

conspiracy and SCUTPA claims.  JA4434-4435, JA5061.  The jury did not find Moss & Kuhn vicariously liable on those claims.  JA4434-4435, JA5061.

Although Nautilus asked the jury to award $3.8 million in compensatory damages, JA4989, JA4019, JA5019, JA5033, the jury awarded only $1.25 million. JA4435.  The jury awarded Nautilus $50.00 in punitive damages on the civil conspiracy claim.  JA4436, JA5074-5075.

Nautilus elected its remedy under the SCUTPA claim, not the civil conspiracy claim.  JA4539.  The district court trebled the damages and awarded attorneys' fees on the SCUTPA claim.  Noting that Fleming knowingly and willfully "committed multiple acts of unfair and deceptive practices" and that his "unfair and deceptive acts played a critical role in Murdaugh's ability to ultimately steal over $4 million in settlement funds," the district court ordered Fleming to pay $3.75 million, Nautilus's attorney's fees ($289,616.63) and costs ($7,625.72).  JA4437-4438, JA4535-4538.

On January 31, 2025, the district court entered judgment for Nautilus and against Fleming for $4,047,242.35.  JA5080.  Fleming has minimal assets and Nautilus not been able to collect on this judgment.  JA5069, JA5065-5068, JA5070.

26

## SUMMARY OF ARGUMENT

The district court improperly blocked Nautilus' discovery into the relationship between the Bank and Murdaugh that predated the Satterfield fraudulent settlement. That discovery was relevant to the issues and claims – including the SCUTPA, conspiracy, and RICO claims because Murdaugh and Laffitte had engaged in a similar scheme for a decade involving Murdaugh's clients. The discovery would have revealed the broad scope of Murdaugh's prior conspiracy with the Bank and established the Bank's culpability in this case.

The district court compounded its error by granting summary judgment for the Bank and Westendorf on the basis that Nautilus purportedly lacked evidence to substantiate its claims. The district court essentially blocked Nautilus from obtaining support for its claims against the Bank, and then granted judgment for the Bank based upon that very lack of evidence. The district court's legal rulings on the SCUTPA, RICO, and negligence claims were also incorrect as a matter of law, and there was sufficient record evidence to create a jury question on some of these claims.

The district court should not have granted summary judgment for Moss & Kuhn on the unjust enrichment claim based on Nautilus' failure to prove an expectation of payment when the South Carolina Supreme Court has removed this

27

as an element for such a claim.  There was also enough record evidence to make this an issue for the jury.

The district court should not have granted a directed verdict for Moss & Kuhn on the claim for breach of fiduciary duty when Nautilus presented evidence that: Moss & Kuhn, as an escrow agent, owed Nautilus, as payor, a fiduciary duty to safeguard and protect Nautilus' settlement funds until the escrow condition was satisfied. Moss & Kuhn breached that duty by disbursing the settlement funds without a filed order approving the settlement; and Nautilus was damaged by the improper disbursement when Fleming and Murdaugh misappropriated the settlement funds earmarked for the Satterfield Estate.

The district court should not have granted a directed verdict for Moss & Kuhn on the direct negligence claims when there were disputed questions of material fact regarding whether Moss and Kuhn: (1) assumed a duty as an escrow agent to follow the condition on the escrow funds by accepting the settlement funds into its trust account; (2) negligently supervised Fleming; and (3) negligently monitored its trust account by allowing Fleming to fabricate expenses and divert settlement funds from the account to Murdaugh.

The district court should have granted a directed verdict to Nautilus on the vicarious liability of Moss & Kuhn for the actions of its named partner Fleming when the firm directly benefitted from Fleming's misconduct by taking a substantial fee,

28

and Fleming never stepped out of his role as counsel for the Satterfield Estate when he conspired with Murdaugh to steal his clients' settlement monies.

Finally, the district court should have granted Nautilus' motion for partial summary judgment on the proximate cause of its injury when the settlement was void by not being filed. The *Rooker-Feldman* doctrine did not divest the district court's jurisdiction when Nautilus did not "lose" in state court, and there was no predicate state court judgment.

## ARGUMENT

**I.  THE DISTRICT COURT ABUSED ITS DISCRETION IN PROHIBITING DISCOVERY INTO THE PRIOR RELATIONSHIP BETWEEN PALMETTO STATE BANK AND MURDAUGH AND ERRED IN GRANTING SUMMARY JUDGMENT FOR THE BANK AND WESTENDORF**

After the district court blocked Nautilus' discovery of the prior relationship between the Bank and Murdaugh, it granted summary judgment for the Bank and Westendorf on Nautilus' claims for conspiracy; violation of SCUTPA; and aiding and abetting breach of fiduciary duty.  JA3741, JA3749, JA3755.  The district court abused its discretion in denying Nautilus the discovery to support those claims and then relying upon that very lack of discovery to grant summary judgment for the Defendants.  *See generally* JA1494-1498, JA3461-3472.

"Parties to a civil litigation may obtain discovery regarding 'any nonprivileged matter that is relevant to any party's claim or defense' so long as the information is 'proportional to the needs to the case. . . .'" *Koppers Performance Chems., Inc. v. Travelers Indem. Co.,* 638 F. Supp. 3d 610, 612 (D.S.C. 2022) (quoting Fed. R. Civ. P. 26(b)(1)).  The "relevance" of discovery "is construed very liberally."  *Avant v. Ahern Rentals, Inc.,* No. 3:20-CV-01884, 2022 WL 585947, at *2 (D.S.C. Feb. 24, 2022).  A fact is relevant if it relates to "any matter that bears on, *or that reasonably could lead to other matter that could bear on*, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351

30

(1978) (emphasis added); *see also Avant,* 2022 WL 585947, at \*2 ("A discovery request is relevant 'if there is *any possibility* that the information sought might be relevant to the subject matter of [the] action.'" (emphasis added)). "A variety of types of information not directly pertinent to the incident in suit could be relevant to the claims or defenses raised in a given action. For example, other incidents of the same type . . . could be properly discoverable under the revised standard." Committee Notes on Rules—2000 Amendment, FRCP 26(b)(1).

This Court disfavors summary judgment before the close of discovery. *See E.I. du Pont De Nemours & Co. v. Kolon Indus., Inc.,* 637 F.3d 435, 448-49 (4th Cir. 2011) (summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery"); *McCray v. Maryland Dep't of Transp.,* 741 F.3d 480, 483 (4th Cir. 2014) ("Summary judgment before discovery forces the non-moving party into a fencing match without a sword or mask."). This is especially true in the context of a conspiracy claim. *See Cent. Weslyan Coll. v. W.R. Grace & Co.,* 143 F.R.D. 628, 646 (D.S.C. 1992), *aff'd,* 6 F.3d 177 (4th Cir. 1993) (refusing to grant summary judgment on conspiracy when discovery was "not complete concerning the existence or contours of [the] conspiracy"). Nautilus' theory of liability was that the Bank, its officers and agents (including Laffitte and Westendorf), and Murdaugh, one of its biggest clients, conspired and engaged in a pattern of unfair practices by secretly agreeing that the Bank's officers would serve

31

as fiduciaries as directed by Murdaugh—who was consistently and severely indebted to the Bank—to enrich themselves and to satisfy debts owed by Murdaugh to the Bank. This secret agreement harmed Nautilus, which—like many others before it—did not know of the scheme.

On the SCUTPA claim, for example, the district court found that Nautilus' theory "lacks evidentiary support." JA3749. But the district court denied Nautilus the discovery it needed to gather evidentiary support for this claim. For example, discovery into Laffitte's prior schemes with Murdaugh would have revealed the scope and nature of the decade-long conspiracy between Murdaugh and Laffitte to steal money from third parties. That discovery would have also bolstered the public interest element of this claim which can be proven by establishing that the same kind of actions occurred in the past. *See Wright v. Craft,* 640 S.E.2d 486, 502 (S.C. Ct. App. 2006).

Moreover, the district court's conclusion that there could be no "deceptive or unfair practice in the conduct of trade or commerce," *see* JA3749, was legally incorrect because "[t]he provision of *any* service constitutes commerce within the meaning of UTPA." *Taylor v. Medenica,* 479 S.E.2d 35, 44 (S.C. 1996) (emphasis in original); *see also* S.C. Code Ann. § 39-5-10(b) (defining "trade" and "commerce" as the "sale *or distribution of any services*" (emphasis added)). The Bank expressly

32

and knowingly authorized its officers to serve as sham fiduciaries, enabling and concealing the theft of funds, including funds from those they owed a duty to protect.

On the conspiracy claim, the district court found "insufficient evidence to sustain Nautilus' claim that Westendorf or [the Bank] were engaged in a civil conspiracy to defraud Nautilus." JA3741. But again, discovery would have revealed that the Bank and Murdaugh engaged in a far-reaching conspiracy that expanded to cases predating the Satterfield claim. In short, Nautilus alleged a conspiracy and was entitled to discover the scope of that conspiracy. Further, discovery about the prior relationship between Murdaugh and the Bank was relevant because "[c]ircumstantial evidence tending to prove a conspiracy may consist of a *defendant's relationship with other members of the conspiracy*, *the length of this association*, the defendants' attitude and conduct, and the nature of the conspiracy." *See United States v. Pemberton*, 713 Fed. Appx. 221, 222 (4th Cir. 2018) (alterations omitted & emphasis added).

This was not an unbridled fishing expedition. Laffitte, a Bank officer and branch manager, was convicted of conspiring with Murdaugh to steal funds dating back to 2011. *See* JA107, JA109. As an officer of the Bank, his actions and knowledge are imputed to the Bank. Laffitte also personally authorized Westendorf to serve as personal representative for the Satterfield Estate – at Murdaugh's request – on behalf of the Bank. JA252.

33

The district court's rationale for granting summary judgment for the Bank and Westendorf highlights this error. The district court declined to impute Laffitte's actions to the Bank for activity not alleged to involve Lafitte because Lafitte was not a defendant, and the evidence *at that point* did not reveal Laffitte's involvement in defrauding Nautilus. JA3741. But, despite Laffitte's express authorization of Westendorf's sham service as personal representative, the district court denied Nautilus discovery that may have linked Lafitte and/or other Bank employees to the Satterfield claim.

The district court also relied on Fleming's admission that Westendorf was not aware of his fraudulent scheme with Murdaugh. JA3741. Aside from the inherent flaw in accepting Fleming's testimony at face value given his credibility issues, and improperly assuming the role of fact-finder, the district court overlooked that other Bank officers, including Laffitte, may have been aware of Murdaugh's scheme, and that Fleming's actions are imputed to his client, Westendorf. *See In re S.C. NAACP Hous. Advoc. Program*, 897 S.E.2d 691, 696 (S.C. 2024); *see also* JA681-683.

On the RICO claim, Nautilus pointed to the previous fraudulent conspiracy of Murdaugh and Laffitte to launder money through the Bank to argue an association-in-fact enterprise involving the Bank and Murdaugh. The district court found "this connection to be far too attenuated to sustain Nautilus' RICO claim." JA3760. But having denied Nautilus' discovery of the scope and extent of Murdaugh and Lafitte's

34

fraudulent activities, the district court should not have made this finding. *See* JA3575 ¶ 5.

On the negligence claims against the Bank and Westendorf, the district court erred in finding that "Westendorf did not owe Nautilus any duty, and as a result no duty may be imputed from Westendorf to [the Bank]." JA3746. This is inaccurate as a matter of law. Under South Carolina law, "a duty may arise where a defendant creates 'a situation that [it] knew or should have known posed a substantial risk of injury,' . . . to a plaintiff, i.e., negligent or intentional creation of the risk . . . ." *Weatherford v. E.I. Dupont de Neumours & Co.,* No. 4:22-CV-01427, 2023 WL 11015357, at *4 (D.S.C. Sept. 27, 2023) (citations omitted); *see also In re Blackbaud, Inc., Customer Data Breach Litig.,* 567 F. Supp. 3d 667, 682 (D.S.C. 2021) ("A common law duty may arise where a defendant creates 'a situation that [it] knew or should have known posed a substantial risk of injury' to a plaintiff.").

There was sufficient record evidence to create a jury question as to whether the Bank and Westendorf breached their duties to Nautilus. The Bank created a risk to Nautilus by:

- Permitting Murdaugh to persistently remain in overdraft, a significant red-flag for money laundering, despite receiving a daily overdraft report from the Bank's computer system, JA3524-3525, JA1602;

- Permitting and engaging through Laffitte in a decade-long conspiracy with Murdaugh to steal money from his clients and launder it through the Bank while his debt continued to mushroom, JA671;

35

- Directly benefitting from Laffitte's and Westendorf's involvement with Murdaugh and the thefts of funds in that it (i) kept happy an important client who brought in substantial business and who generated over *$4 million in loan interest alone*, and (ii) used Murdaugh's stolen Nautilus monies to pay back Bank loans and overdrafts.[9]  JA671, JA1249-1271.

Additional discovery that was blocked by the district court could have also supported this claim.

As for Westendorf, among other things, he falsely verified in the petition for the approval of the settlement that he had notified all interested persons, *see* JA3877 ¶ 2, accepted an exorbitant fee of $30,000 for acting as a sham fiduciary, *see* JA4177-4178, and took no steps to ensure that the Nautilus funds were retained in escrow until there was a filed order.  JA1129-1130.

There was also record evidence to substantiate Nautilus' claim against the Bank for negligent failure to supervise and train.  "An employer owes a duty of care to a third party when the possible harm resulting to the third party by the employee could have been reasonably anticipated by the employer." *Rickborn v. Liberty Life Ins. Co.,* 468 S.E.2d 292, 299 (S.C. 1996). "Where a principal '[i]s alerted to the fact that [its agent]'s carelessness could cause harm,' it may 'breach[] a duty of care owed to [a third-party] by failing to properly supervise [the agent].'" *Id.*  No direct "relationship" between Nautilus and the Bank was required – the Bank owed a duty

---

[9] The district court also did not allow discovery on this issue.

36

not to create an "undue risk of harm to the public." *See James v. Kelly Trucking Co.*, 661 S.E.2d 329, 330 (S.C. 2008).

Despite repeatedly authorizing and empowering its officers to serve as court fiduciaries, which resulted in conversion and theft, the Bank's former CEO testified about the risk of approving a bank's financial officer as a personal representative who did not know what he could or could not do with other people's money and conceded that someone in the that position needs training. JA3504. Further, because Laffitte was a Bank officer, "knowledge [of his malfeasance] must be imputed to the [B]ank." *See, e.g., Citizens' Bank v. Heyward*, 133 S.E. 709, 716 (S.C. 1925) (Featherstone, J., concurring); *see also id.* at 712.

The Bank's express approval of Westendorf as personal representative constituted a breach of the Bank's duty to train and supervise Westendorf for that role. Westendorf had never served as a personal representative, did not know his duties and obligations, and made no attempt to educate himself. Had he been properly trained and supervised and alerted to Laffitte's prior malfeasance, he would not have rubber-stamped Murdaugh and Fleming's actions. *See* JA1818. As found by the district court: "Westendorf undeniably failed in his duties as Personal Representative of the Satterfield Estate, neglecting to undertake even basic due diligence to protect the Estate's interests." JA3743; *see also* JA1599-1600.

37

## II. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT FOR MOSS & KUHN ON THE UNJUST ENRICHMENT CLAIM AND DIRECTING A VERDICT FOR MOSS & KUHN ON THE BREACH OF FIDUCIARY DUTY AND NEGLIGENCE CLAIMS

### A. The District Court Erred in Granting Summary Judgment for Moss & Kuhn on the Unjust Enrichment Claim Based on Nautilus' Failure to Prove an Expectation of Payment

The district court granted summary judgment for Moss & Kuhn on Nautilus' unjust enrichment claim, finding that "Nautilus had no 'expectation of payment' from any Defendant, which "is an element of quantum meruit action in South Carolina." JA3757 (citing, in part, *Webb v. First Fed. Sav. & Loan Ass'n*, 388 S.E.2d 823, 827 (S.C. Ct. App. 1989)).

As a threshold issue, Nautilus' claim was for unjust enrichment, not quantum meruit, which is generally not a claim but a remedy for unpaid goods, materials or services. *See Myrtle Bch. Hosp., Inc. v. City of Myrtle Bch.*, 532 S.E.2d 868, 872 (S.C. 2000) (clarifying that "quantum meruit, quasi-contract, and implied by law contract are equivalent terms for an equitable remedy"); *Columbia Wholesale Co., Inc. v. Scudder May N.V.*, 440 S.E.2d 129, 130 (S.C. 1994) (recognizing that "quantum meruit [i]s an equitable doctrine to allow recovery for unjust enrichment"). To the extent that "through the years [quantum meruit] has come to include a cause of action," *Webb*, 388 S.E.2d at 827, it applies to the furnishing of "services and materials," not settlement monies.

More to the point, the South Carolina Supreme Court overruled *Webb's* test

38

for quantum meruit and removed the "expectation of payment" element, requiring only: "(1) [a] benefit conferred by plaintiff upon the defendant; (2) realization of that benefit by the defendant; and (3) retention of the benefit by the defendant under circumstances that make it inequitable for him to retain it without paying its value." *See Myrtle Beach Hosp.,* 532 S.E.2d at 872-73; *see also Thomerson v. DeVito*, 844 S.E.2d 378, 385 (S.C. 2020) (noting that because of "confusion in prior case law as to implied-in-fact versus implied-by-law contracts, and it adopted a three-part test 'as the sole test for a quantum meruit/quasi-contract/implied by law claim,' overruling prior decisions employing a different analysis").

Therefore, the "expectation of payment" element did not apply to Nautilus' unjust enrichment claim. Nautilus was also seeking restitution from Moss & Kuhn as the remedy for payment of the settlement monies, not quantum meruit. *See* JA1360 ¶¶ 85, 86. The district court therefore erred in granting summary judgment to Moss & Kuhn on the unjust enrichment claim.

Even if "expectation of payment" were an element, the district court's analysis was, respectfully, flawed. Nautilus' settlement funds were paid into Moss & Kuhn's trust account with the expectation that, should the settlement not be approved and/or the order not filed as required by law, the funds would be returned to Nautilus. *See* JA4851, JA4852, JA4863-4864. Nautilus expected it, not only because it is the sensible and just result, but also because it is the law. *See Anderson Cnty. v. Preston,*

39

831 S.E.2d 911, 918 (S.C. 2019) (holding that because a severance agreement was void, the severed employee was required to return the monies and benefits paid pursuant to the agreement with his employer).

Further, there was sufficient record evidence supporting this claim to have made this an issue for the jury. "An action for money had and received exists where a defendant has money belonging to the plaintiff which in equity should be repaid to the plaintiff." *Okatie River, L.L.C. v. Se. Site Prep, L.L.C.,* 577 S.E.2d 468, 472 (S.C. Ct. App. 2003). "[A]n action for money had and received will lie are ***when the plaintiff paid money to the defendant under an unenforceable contract*** . . . ." *Id.* at 472–73 (citing 42 C.J.S. *Implied Contracts* §§ 14 and 19 (1991) (emphasis added)). Given Murdaugh's admitted fraud which triggered an exclusion under the Nautilus policy, *see* JA3908 ¶ IV.Q(4), JA1107, and the non-filing of the order approving the settlement, the settlement funds should not have been disbursed from the trust account, but paid back to Nautilus. Moss & Kuhn is liable coextensively with Fleming. *See* S.C. Code Ann. § 33-19-340(b).

40

**B.    There Were Disputed Questions of Material Fact Precluding a Directed Verdict for Moss & Kuhn on the Claim for Breach of Fiduciary Duty**[10]

"To establish a claim for breach of fiduciary duty, the plaintiff must prove (1) the existence of a fiduciary duty, (2) a breach of that duty owed to the plaintiff by the defendant, and (3) damages proximately resulting from the wrongful conduct of the defendant." *RFT Mgmt. Co. v. Tinsley & Adams L.L.P.,* 732 S.E.2d 166, 173 (S.C. 2012).

In denying Moss & Kuhn's motion for summary judgment on this claim, the district court found that Moss & Kuhn owed a fiduciary duty to Nautilus, but whether there was a breach of that duty was a question for the jury.[11]  *See* JA3750-3752 (citing *Spence v. Wingate,* 716 S.E.2d 920, 928 (S.C. 2011)).  At trial, however, the district court reversed course, directed a verdict for Moss & Kuhn on this claim, and found that there was no duty, no injury, and that "no reasonable jury could find that there was any breach of a duty." JA4915, JA4918; *see also* JA4919; JA4961.  As discussed below, the trial court was incorrect – Moss & Kuhn owed a duty to

---

[10] This Court reviews directed verdicts *de novo* to determine "whether, without weighing the evidence or considering the credibility of witnesses, there can be but one conclusion as to the verdict that reasonable jurors could have reached." *Trigo v. Moore*, No. 92-1516, 1993 WL 192758, at *2 (4th Cir. June 7, 1993) (internal quotations omitted). "This inquiry focuses on whether there was sufficient evidence for a jury to proceed to reach a verdict." *Id.*

[11] Moss & Kuhn's motion rested on the sole claim that it owed no fiduciary duty to Nautilus.  *See* JA1540-1541.

41

Nautilus as previously found by the district court; there was evidence of a breach; and Nautilus was injured by the release of the escrowed funds without satisfaction of the escrow condition.

### 1. Moss & Kuhn Owed a Fiduciary Duty to Nautilus.

The *existence* of a fiduciary duty is a question of law for the court, so this issue is reviewed de novo. *Hooper v. UnitedHealth Grp. Inc.,* No. CIV.A. 6:12-01519, 2013 WL 6654226, at *2 n.6 (D.S.C. Dec. 17, 2013). "A confidential or fiduciary relationship exists when one imposes a special confidence in another, so that the latter, in equity and good conscience is bound to act in good faith and with due regard to the interests of the one imposing the confidence." *Davis v. Greenwood Sch. Dist. 50,* 620 S.E.2d 65, 68 (S.C. 2005).

Generally, an escrow agent owes a fiduciary duty to the payor of the escrow funds to: (i) safeguard the funds while they remain in escrow, (ii) abide by the escrow conditions attached to the funds, and (iii) return the funds to the payor if the conditions are not satisfied. *See In re Dameron,* 155 F.3d 718, 723 (4th Cir. 1998) (applying Virginia law). *See generally* Am. Jur *Escrow* §§ 1, 3 (May 2025 Update). The South Carolina Supreme Court has recognized that a fiduciary duty "arises from an attorney's role as an escrow agent [that] is independent of an attorney's status as a lawyer and distinct from duties that arise out of the attorney/client relationship." *Moore v. Weinberg*, 681 S.E.2d 875, 878 (S.C. 2009); *see, e.g., id.* at 875-78 (holding

42

that attorney was "liable to a third party for disbursing funds to the attorney's client where the attorney was aware that the funds were assigned to the third party").

Here, Moss & Kuhn represented the party legally entitled to the escrow funds (the Satterfield Estate), not the party from whom the funds were owed (Nautilus). This distinction, however, is immaterial for recognizing the fiduciary duty owed by Moss & Kuhn to Nautilus because Moss & Kuhn's role as escrow agent existed independently of an attorney-client relationship. Because Moss & Kuhn induced the confidence placed in it by acting as the escrow agent to whom Nautilus delivered the escrow funds, Moss & Kuhn owed a fiduciary duty to Nautilus.

### 2. There Were Genuine Questions of Material Fact Regarding Whether Moss & Kuhn Breached Its Fiduciary Duty as Escrow Agent.

Upon the deposit of Nautilus' funds into Moss & Kuhn's escrow account, Moss & Kuhn (a payee on Nautilus' check) agreed to the conditions in the letter accompanying the check; namely, that the funds would be held in escrow unless and until an order approving the settlement was filed in the probate court. JA4154. The parties modified this condition by agreeing to file the order in circuit court. JA2990, JA3040. It is undisputed that Moss & Kuhn disbursed Nautilus' funds without a filed order approving the settlement.

Although it was disputed at trial *who* would file the order (Fleming or Grantland), this fact is not material to whether Moss & Kuhn breached its fiduciary

43

duty to Nautilus.  Fleming's authority to withdraw funds from Moss & Kuhn's trust account also does not insulate Moss & Kuhn from liability.  *See* JA1542.  As a professional corporation, it is coextensively liable for Fleming's actions as a matter of South Carolina law, S.C. Code Ann. § 33-19-340(b), and, was ultimately responsible for the improper disbursement of funds as the owner of the trust account.

Whether the law required the order to be filed is also irrelevant because Grantland conditioned the release of the escrow funds on the filing of the order.  Fred Kuhn testified that settlement funds are "usually" not disbursed until the order approving the settlement is filed and he would not do it.  JA4507.  He also testified that it would be "wrong" to release settlement funds when there was an instruction not to release them before the order was filed.  JA4508-4509.  In any event, South Carolina law requires an order to be filed to be valid.  *See Upchurch v. Upchurch*, 624 S.E.2d 643, 646 (S.C. 2006), *disapproved on other grounds by*, *Miles v. Miles,* 711 S.E.2d 880 (S.C. 2011) (holding that an order only becomes the judgment of the court and "fixes the rights of the parties" after it is filed); *see also Bowman v. Richland Mem'l Hosp.*, 515 S.E.2d 259, 260 (S.C. Ct. App. 1999) ("An order is not final until it is . . . entered by the clerk of court.").  *See, e.g., Tefft v. Tefft*, No. 2011-UP-096, 2011 WL 11733114, at *1 (S.C. Ct. App. Mar. 10, 2011) (finding that an order approving a reconciliation agreement was only final after it was filed).

44

At best, there were genuine questions of material fact regarding the breach of fiduciary duty precluding a directed verdict in Moss & Kuhn's favor.

### 3. Nautilus Was Damaged By Moss & Kuhn's Breach.

"One standing in a fiduciary relationship with another is subject to liability to the other for harm resulting from a breach of duty imposed by the relation." *Davis*, 620 S.E.2d at 68. Moss & Kuhn disbursed the settlement funds without the escrow condition of a filed approval order. As a result, the escrow funds were not disbursed to Nautilus' intended recipient – the Satterfield Estate – but were redirected to Murdaugh who misappropriated the funds. Because Nautilus' settlement monies did not reach the party with whom it settled, Nautilus suffered injury.

### C. There Were Disputed Questions of Material Fact Precluding a Directed Verdict for Moss & Kuhn on the Direct Negligence Claim

The district court directed a verdict for Moss & Kuhn on the direct claim of negligence because it did not believe that Moss & Kuhn owed any duty to Nautilus. JA4965, JA4966, JA4968. The district court erred.

"In a negligence action, a plaintiff must show that (1) the defendant owes a duty of care to the plaintiff, (2) the defendant breached the duty by a negligent act or omission, (3) the defendant's breach was the actual and proximate cause of the plaintiff's injury, and (4) the plaintiff suffered an injury or damages." *Moore*, 681 S.E.2d at 878. In *Moore*, the South Carolina Supreme Court held that an attorney

acting as an escrow agent must comply with conditions on the escrow funds before disbursing them or be liable for negligence. *Id.* at 877-78.

Nautilus advanced three theories of negligence against Moss & Kuhn: (1) by accepting the settlement funds into its trust account, it assumed a duty as an escrow agent to follow the condition on the escrow funds, (2) it negligently supervised Fleming and (3) it negligently monitored its trust account, by allowing Fleming to fabricate expenses and divert the settlement funds from the account to Murdaugh. JA1365-1367.

As discussed above, Moss & Kuhn, as an escrow agent, owed Nautilus a duty to safeguard the funds and to not release them before there was a filed approval order. Moss & Kuhn breached its duty to Nautilus by allowing Fleming to disburse the funds before this condition was satisfied. *See Moore*, 681 S.E.2d at 877-78

Nautilus also presented evidence at trial to support the two other negligence theories. Moss & Kuhn's accountant reconciled the firm's operating and trust accounts and one or more of the firm's shareholders reviewed it about once a month. JA4461, JA4939, JA4952. Nevertheless, no one inquired about backup to the fabricated expenses allegedly incurred by Fleming and accepted at face-value expenses of $8,000, $8,500, and $9,700 paid directly to Fleming. JA4952, JA4177-4178. The monthly bank statement for the trust account also included check images

which showed that the settlement funds were not remitted to the firm's clients but to Murdaugh.  JA4958, JA4729-4730.

## III. THE DISTRICT COURT ERRED IN DENYING NAUTILUS' MOTION FOR DIRECTED VERDICT ON THE VICARIOUS LIABILITY OF MOSS & KUHN FOR THE ACTIONS OF ITS PARTNER CORY FLEMING

The district court denied Nautilus' motion for directed verdict on its vicarious claims against Moss & Kuhn because it found that "a number of [facts] are in contest" presenting a jury question.  JA4969.  "A domestic or foreign professional corporation whose employees perform professional services within the scope of their employment or of their apparent authority to act for the corporation is liable to the same extent as its employees."  S.C. Code § 33-19-340(b).  Although whether an employee's actions are taken within the scope of one's employment or authority is often a question of fact for the jury, it may be decided as a matter of law when there are no genuine questions of material fact.  *Murphy v. Jefferson Pilot Commc'ns Co.*, 613 S.E.2d 808, 813 (S.C. Ct. App. 2005).

"The modern doctrine of *respondeat superior* makes a master liable to a third party for injuries caused by the tort of his servant committed within the scope of the servant's employment."  *Froneberger v. Smith*, 748 S.E.2d 625, 633 (S.C. Ct. App. 2013).  A servant acts within the scope of employment if the action: (1) is reasonably necessary to accomplish the purpose of the servant's employment; and (2) the action furthers the master's business.  *Tedder v. Dixie Lawn Serv., Inc.,* No. 2007-UP-249,

47

2007 WL 8327512, at \*2 (S.C. Ct. App. May 22, 2007); *Wade v. Berkeley Cnty.*, 498 S.E.2d 684, 688 (S.C. Ct. App.1998). "[T]he master is liable for the torts of his servant even when the servant acts against the express instructions of his master, so long as the servant acts to further the master's business." *Wade,* 498 S.E.2d 684, 688. Even if the servant's actions "may exceed his authority," he will still be considered as furthering the master's business if he is performing "*some act* in furtherance of the master's business." *Jones v. Elbert*, 34 S.E.2d 796, 798 (S.C. 1945) (emphasis added). Stated another way, a servant's conduct falls outside the scope of his employment" only if the servant's actions are entirely for his own "independent purpose . . . *wholly disconnected with the furtherance of his master's business.*" *Crittenden v. Thompson-Walker Co., Inc.*, 341 S.E.2d 385, 387 (S.C. Ct. App. 1986) (emphasis added); *accord* RESTATEMENT (SECOND) OF AGENCY § 228(1) (1958) ("Conduct of a servant is within the scope of employment if, but only if: (a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; [and] (c) it is actuated, *at least in part*, by a purpose to serve the master. . . ." (emphasis added)).

Almost 30 years ago, the South Carolina Supreme Court reinforced the principle that a master can be liable for its servant's intentional torts including:

> frauds, deceits, concealments, misrepresentations, negligences, and other malfeasances and omissions of duty of his agent in the course of his employment, although the principal did not authorize or justify or participate in, or indeed, know of such misconduct, or even if he

48

forbade the acts or disapproved of them. In all such cases, the rule applies *respondeat superior;* and it is founded upon public policy and convenience, for in no other way could there be any safety to third persons in their dealings, either directly with the principal, or indirectly with him through the instrumentality of agents. In every such case the principal holds out his agent as competent and fit to be trusted, and thereby, in effect, he warrants his fidelity and good conduct in all matters within the scope of the agency.

*Rickborn*, 468 S.E.2d at 298; *see also* Ralph K. Anderson, Jr., Master & Servant - Liability of Master, S.C. Requests to Charge – Civ. § 5-7 ("A master is subject to liability for the intended tortious harm by a servant to the person or things of another by an act done in connection with the servant's employment, although the act was unauthorized, if the act was not unexpected in view of the duties of the servant."). *See, e.g., Crittenden*, 341 S.E.2d at 387–88 (finding evidence supported that foreman was in the scope of his employment when he attacked lessee of building being renovated;  assault occurred at the job site during working hours, when foreman was engaged in activities incident to foreman's general duty to supervise the work, and the purpose of the assault was to coerce lessee to pay a debt owed to the master); *see also Woods v. Dolgencorp, Inc.*, No. 7:20-CV-04399, 2021 WL 5989965, at *3 (D.S.C. Dec. 17, 2021) (holding that employee's theft of a deposit occurred within the course and scope of her employment because her employer directed her to make the deposit).

49

Given the following undisputed facts, the district court should have found, as a matter of law, that Fleming was acting in the course and scope of his employment as a firm partner when he diverted the settlement funds to Murdaugh:

- Fleming accepted Murdaugh's request to bring a wrongful death claim against him on firm letterhead, *see* JA4072, and the firm authorized Fleming to represent the Satterfield Estate. JA4605, JA4496.

- Fleming was engaged in "legitimate legal work" for the Satterfield Estate. JA4605.

- Fleming aspired to maximize the estate's claim, *see* JA4639, and settled the claim. JA4845, JA3058-3059.

- Fleming directed the settlement check be made payable, in part, to: "Moss Kuhn & Fleming PA as Attorney." JA4702-4703, JA4152, JA4154.

- Grantland sent the settlement check to Fleming at his firm address. JA4850-4851, JA4154.

- Fleming deposited the check into the firm's trust account. JA4703, JA2988-2989.

- The firm collected a fee of $600,055.59 fee from the Nautilus settlement. JA4598-4599, JA4725, JA4741-4742, JA4178.

- Fleming took a fee from the firm's fee and the balance was moved into the firm's operating account to pay firm expenses. JA4956.

Accordingly, the district court should have found that Moss & Kuhn was vicariously liable for Fleming's acts as a matter of law.

50

**IV.    THE DISTRICT COURT ERRED IN DENYING NAUTILUS'
MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE
DEFENSE THAT THE SETTLEMENT WAS THE PROXIMATE
CAUSE OF NAUTILUS' INJURY RATHER THAN DEFENDANTS'
CONDUCT BECAUSE THE SETTLEMENT WAS VOID**

Nautilus sought partial summary judgment as to whether the settlement was
the proximate cause of its injury rather than the Defendants' conduct.  The district
court erred in denying the motion.

The district court relied on the *Rooker-Feldman* doctrine to conclude that it
"does not have jurisdiction to invalidate a settlement approved by a South Carolina
court."[12]  JA3738.  Setting aside that there was no filed approval order, the doctrine
only applies in "cases brought by *state-court losers* complaining of injuries caused
*by state-court judgments* rendered before the district court proceedings commenced
and *inviting district court review and rejection of those judgments*."  *Exxon Mobil
Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005) (emphasis added).  The
doctrine did not apply here because:  (1) Nautilus did not "lose" in state court
because the non-adversarial proceedings only related to the approval of a
settlement;[13] and (2) there was no judgment entered, so Nautilus was not inviting the

---

[12] This doctrine was not raised by any parties below.

[13] The Satterfield Estate never filed suit against Murdaugh.  Even if a lawsuit
had been filed, Nautilus would not have been a party to it as Murdaugh's insurer and
would not have been a "loser."  *See Lance v. Dennis*, 546 U.S. 459, 465 (2006)

51

district court to reject a judgment. Therefore, the doctrine did not apply.[14] *See, e.g.,* *Fabre v. Bank of Am. Bank, NA*, 523 Fed. Appx. 661, 664 (11th Cir. 2013); *Dubuc v. Mich. Bd. of Law Examiners,* 342 F.3d 610, 619 (6th Cir. 2003).

Had the district court addressed the merits of the motion, it should have been granted. Under South Carolina an order has no legal effect until it is filed. *See Upchurch*, 624 S.E.2d at 646. Because the approval order was never filed, the settlement was a nullity and was not the proximate cause of Nautilus' injury as a matter of law. The jury's award of $1.25 million – less than the full amount of the $3.8 million settlement – shows that this was harmful error. *See* JA4435.

## CONCLUSION

Based on the foregoing, this Court should: (1) reverse the summary judgment for the Bank and Westendorf and remand to permit Nautilus' discovery into the prior acts of the Bank; (2) remand for entry of judgment for Nautilus on its vicarious claims against Moss & Kuhn; (3) remand for a new trial against Moss & Kuhn on the unjust enrichment, breach of fiduciary duty, and negligence claims; and (4) remand for partial summary judgment for Nautilus finding that the settlement was not the proximate cause of its injury.

---

(holding that *Rooker-Feldman* doctrine does not apply to non-parties who were in privity with a party).

[14] To the extent that the doctrine applies to any state court decision, it would still would not apply here when the state court's order was never filed.

## STATEMENT REGARDING ORAL ARGUMENT

Nautilus respectfully requests oral argument. This appeal addresses, among other issues, a party's right to discovery before disposing of its claims on summary judgment; a law firm's vicarious liability for the misconduct of one of its named partners; and a law firm's direct liability for a partner's mishandling of client's funds that pass through the firm's trust account. Oral argument would significantly aid the decisional process.

Respectfully submitted:

/s/ Jack R. Reiter
Jack R. Reiter, FBN 0028304
jack.reiter@gray-robinson.com
333 S.E. 2nd Ave., Ste. 3200
Miami, FL 33131
Tel.: (305) 416-6880
Fax: (305) 416-6887

- and -

Jaan G. Rannik, D.S.C. Bar No. 12621
jgr@epting-law.com
Epting & Rannik, LLC
44 Old Queechy Road
Canaan, NY 12029
Tel.: (843) 377-1871
Fax: (843) 377-1310

*Counsel for Appellant Nautilus Insurance Company*

53

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

1.      This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):  This brief contains **11,711** words.

2.      This brief complies with the typeface requirements because:  This brief has been prepared in a proportional spaced typeface using Microsoft Word in 14 point Times New Roman.

/s/ Jack R. Reiter

Party Name:  Appellant Nautilus Insurance Company

Date: October 10, 2025